OPINION OF THE COURT
Michael D. Stallman, J.
In this action to recover under two insurance policies, plaintiffs Janet Johnson and Albert Nicklas (Nicklas) move, pursuant to CPLR 3212, for summary judgment on the complaint, and for the dismissal of defendant’s counterclaims. Defendant Metropolitan Life Insurance Company (MetLife) cross-moves for leave to amend its answer to include a claim under the New Jersey Insurance Fraud Prevention Act (FPA).
These motions raise unusual questions concerning choice of law and the applicability of the USA PATRIOT Act’s anti-money laundering provisions.
Background
On June 10, 2003, MetLife issued two policies of life insurance on the life of George Nicklas (decedent), Johnson’s uncle, a policy for $700,000, policy number xxx-xxx-909-xx (909 policy), of which Johnson was the beneficiary, and a policy for $250,000, policy number xxx-xxx-869 xx, of which Nicklas was *958 the beneficiary. As relevant herein, the decedent, a New Jersey resident, indicated on the applications that he would be paying the premiums on the policies. (See aff of Thomas M. Campbell, exhibit 1, complaint, exhibits 1, 2.) On July 10, 2003, ownership of the 909 policy was transferred to Johnson. (Notice of motion, exhibits 3, 4.)
Despite the indication on the applications that decedent would be paying the premiums on the policies, all of the premiums appear to have been paid by Johnson’s husband, Tony Stanley.[1] On three occasions, Stanley overpaid the premiums, and, on each occasion, the refund was returned to decedent, as if he had paid the premium.
In a letter dated November 29, 2004, MetLife unilaterally purported to void both policies ab initio, on the ground that Stanley, as an unidentified third party, had been making the premium payments. MetLife has not returned the premiums already paid, although it claims that it has attempted to do so on at least two occasions, but has received no instructions from plaintiffs as to how that should be accomplished.
Decedent died on August 12, 2005. Plaintiffs provided notices of claim to MetLife on September 23, 2005. (Complaint, exhibit 4.) MetLife disclaimed in a letter dated November 2, 2005 (id., exhibit 5), on the ground that the policies had been previously voided, as well as on the ground that there were “questions raised as to the possibility that [the insured] may not have even participated in the application process.” (Id. at 1.)
Plaintiffs maintain that they are entitled to summary judgment because MetLife cannot provide a viable excuse for its failure to pay on the policies, in that it had no right to void them. They claim that there is no express provision in the policies which prevents the payment of premiums by anyone other than the person named therein. Indeed, the applications provide a space to identify an “other” payor of the premiums, albeit with questions concerning his or her relationship to decedent, and annual income. (Id.)
MetLife contends that the payment of the premiums by Stanley may have been a form of illegal speculation in insurance, which is disallowed under its underwriting practices, in con *959 junction with, and mandated by, the federal “USA PATRIOT Act,”[2] in order to avoid potential money laundering in furtherance of terrorism. It claims to have a “strict policy” of not accepting third-party checks without knowledge of the source of the funds, especially where payment of the premiums is made by a party who is not closely related to the insured. MetLife argues that decedent falsely represented that he would be paying the premiums, and that plaintiffs actively concealed the identity of the true payor.[3] It claims that it would not have issued the policy had it known that the decedent would not be paying as represented. MetLife maintains that “at minimum, MetLife would have postponed issuing the policy while it conducted an investigation with respect to whether the intended premium payor had an acceptable explanation for paying the premiums” so that it could “properly estimat[e] the degree and character of the risk it was assuming.” (MetLife’s mem of law in opposition at 2.)
MetLife also contends that decedent’s medical conditions at the time he died, which included, among other things, cirrhosis of the liver, liver failure, hepatitis, diabetes and hypertension (see aff of James J. McCarthy, exhibit E, emergency room report, dated Oct. 7, 2004), indicate illnesses of long standing, suggesting that the decedent’s true medical condition at the time that he applied for the policy, less than two years after execution of the applications, was dire. Yet, in the applications, decedent denied having any negative medical conditions at all. (Reply aff of Campbell, exhibit 1.) MetLife claims that this situation suggests that decedent misrepresented the state of his health on the applications, and insists that it needs further discovery to document decedent’s medical condition at the time of the applications, to determine whether his answers to the questions regarding his health were fraudulent.
MetLife also moves for leave to amend its answer to plead a counterclaim under the FPA, so as to avoid the two-year statute of limitations created by New York’s “incontestibility provision,” which is contained in all policies issued in this state.
*960 I
Cross Motion for Leave to Amend
It is well established that leave to amend pleadings “ ‘shall be freely given’ absent prejudice or surprise resulting directly from the delay.” (McCaskey, Davies & Assoc. v New York City Health & Hosps. Corp., 59 NY2d 755, 757 [1983], quoting CPLR 3025 [b]; see also Eighth Ave. Garage Corp. v H.K.L. Realty Corp., 60 AD3d 404 [1st Dept 2009].) MetLife’s cross motion to amend presents an issue as to whether this court can permit MetLife to assert a claim based on a New Jersey statute.
Although MetLife makes very little effort to present a choice of law analysis for the court’s consideration, it is apparent that choice of law standards allow for an amendment to include the FPA. “Determining which state’s law controls in [a] contract case is a matter of ‘grouping contacts’ to establish which group has ‘ “the most significant relationship to the transaction and the parties.” ’ ” (Equis Corp. v Mack-Cali Realty Corp., 6 AD3d 264, 266 [1st Dept 2004] [citations omitted].) Factors to be considered are “the places of the contracting, negotiation and performance of the contract, the location of the subject matter of the contract, and the domicile or place of business of the parties.” (Id.) With regard to contracts of insurance, under the “grouping of contacts” approach, a contract for liability insurance should be governed by the law of the state “which the parties understood to be the principal location of the insured risk,” unless another state has “a more significant relationship ... to the transaction and the parties.” (Certain Underwriters at Lloyd’s, London v Foster Wheeler Corp., 36 AD3d 17, 22 [1st Dept 2006], affd 9 NY3d 928 [2007] [internal quotation marks and citations omitted].)
The court finds that, as with a liability policy, the insured risk in a life insurance policy can be found in the state bearing the greatest relationship with the insured, i.e., the insured’s state of residence. In the present case, decedent resided in New Jersey. He also worked there, and notations on the policy indicate that the policy was to be considered a New Jersey policy, negotiated in that state. Decedent answered the question regarding who would pay the policy premiums, and a number of the questions concerning his health at the time he filled out the applications in New Jersey. (Complaint, exhibit 5.) The only New York contact which plaintiffs have provided is a form which indicates that decedent answered more questions concerning his health in a form entitled “Part B” to the applications bearing *961 the notation at the bottom of the page, as far as it is visible, “36K-B-NY (0399).” (Id.) The other forms bear a similar notation, ending in “NJ.”
This court finds that the single reference to New York on one printed form — if indeed it were found to be a “contact” with New York — is an insufficient basis on which to deny MetLife the right to rely on the FPA. In the absence of any real prejudice to plaintiffs, who have always been faced with the question of whether any fraud accompanied the execution of the applications, amendment to allow a counterclaim under the FPA is granted, as set forth below.
The reason MetLife wants to rely on the FPA is to avoid the consequences of New York’s “incontestability” clause, as required in all New York contracts. The incontestability clause is found in Insurance Law § 3203 (a) (3), and requires that “the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue . . . .” MetLife wishes to avoid any potential effect from the application of this statute in order to have the benefit of the FPA’s six-year statute of limitations. (NJ Stat Ann § 17:33A-7 [e].)
MetLife ignores the fact that New Jersey also has an incontestability provision. (See NJ Stat Ann § 17B:26-5.) Subdivision (a) of section 17B:26-5 provides that
“[a]fter 2 years from the date of issue of this policy no misstatements, except fraudulent statements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred . . . commencing after the expiration of such 2-year period” (emphasis supplied).
Therefore, New Jersey’s incontestability statute, unlike New York’s, allows an insurer to void a policy for an application based on fraudulent statements, despite the passage of the two-year incontestability period.
Although there does not appear to be any authority as to the interconnection of the FPA and New Jersey’s incontestability statute, there does not appear to be any conflict between New Jersey’s incontestability clause and a statute, such as the FPA, which makes fraud in the application process actionable. Indeed, the FPA provides that
“a. A person or a practitioner violates this act if he:
“(4) Prepares or makes any written or oral state *962 ment, intended to be presented to any insurance company or producer for the purpose of obtaining:
“(b) an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to an insurance application of contract.” (NJ Stat Ann § 17:33A-4 [a] [4] [b].)[4]
Therefore, under New Jersey law, as applicable to the policy, MetLife may amend its complaint to plead a cause of action under the FPA, take refuge in the FPA’s six-year statute of limitations, and avoid any argument based on either the New Jersey or New York incontestability statutes.
II
Summary Judgment
“The proponent of a motion for summary judgment must demonstrate that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law.” (Dallas-Stephenson v Waisman, 39 AD3d 303, 306 [1st Dept 2007], citing Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985].) Upon proffer of evidence establishing a prima facie case by the movant, “the party opposing a motion for summary judgment bears the burden of ‘producing] evidentiary proof in admissible form sufficient to require a trial of material questions of fact.’ ” (People v Grasso, 50 AD3d 535, 545 [1st Dept 2008], quoting Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) The issue raised in the summary judgment motion is whether MetLife, under its compliance and underwriting policies, applied to the circumstances presented here, had the right to void the policies ab initio, upon finding that Stanley was paying the premiums, and that further, decedent may have lied about his health on the applications, providing yet another ground upon which to void the policies. In order to provide a prima facie case, MetLife first produces the affidavit of Jeffrey Halperin, MetLife’s vice-president of Corporate Ethics and Compliance. Halperin is not an underwriter for MetLife, and produces no copies of MetLife’s underwriting policies. Rather, Halperin produces what appear to be internal compliance *963 instructions and forms that MetLife employees are to use when accepting applications.
MetLife also produces the affidavit of Eileen Kosiner, MetLife’s associate chief underwriter, who also testifies, without benefit of documentary evidence, concerning MetLife’s underwriting practices.
Both Halperin and Kosiner contend that MetLife’s underwriting and compliance policies are meant to satisfy the requirements of the PATRIOT Act. For example, according to what appears to be a memorandum issued by MetLife’s Ethics and Compliance Department (Halperin aff, exhibit B, at 1):
“The MetLife Enterprise is firmly committed to complying with all applicable anti-money laundering laws, rules, and regulations. Specifically, the USA PATRIOT ACT requires MetLife to verify the identity of its customers and understand the source of all funds that it receives for the purchase of financial products. The task of certifying the source of funds for financial product purchases and subsequent payments is extremely difficult when we receive monetary instruments or funds from other than the owner of an account or policy.”
Consequently, MetLife has, as applicable here, devised procedures to track, among other things, third-party checks “written on a checking account, annuitant, or insured of the MetLife account or policy.” (Id.)
While MetLife’s internal compliance memoranda and other documents, as well as its motion papers and affiants, make liberal use of the name “USA PATRIOT Act,” no attempt has been made at all to reference the statute, much less any regulations or requirements contained therein concerning insurance underwriting practices. MetLife fails to even explain what the PATRIOT Act is, or how it regulates any aspect of the insurance industry.
Title III of the PATRIOT Act (Pub L 107-56, 115 US Stat 272) is entitled the “International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001,” and is, as its name suggests, concerned with the problem of money laundering within financial institutions. Pursuant to title III, as reflected in 31 USC § 5312 (a) (2) (M), an insurance company is a “financial institution.” 31 USC § 5318 (h) requires financial institutions, such as insurance companies, to “establish anti-money laundering programs,” with particular attention toward *964 “the development of internal policies, procedures, and controls” (31 USC § 5318 [h] [1] [A]). 31 CFR 103.137, entitled “Anti-money laundering programs for insurance companies,” provides the regulatory framework for the insurance industry with regard to the creation of “anti-money laundering” programs, with emphasis on possible money laundering through the purchase of insurance products. 31 CFR 103.137 (b) provides that “each insurance company shall develop and implement a written anti-money laundering program applicable to its covered products that is reasonably designed to prevent the insurance company from being used to facilitate money laundering or the financing of terrorist activities.” Paragraph (c) sets forth the minimum requirements for the anti-money laundering programs, as applicable, as follows:
“[a]t a minimum, the program required by paragraph (b) of this section shall:
“(1) Incorporate policies, procedures, and internal controls based upon the insurance company’s assessment of the money laundering and terrorist financing risks associated with its covered products. Policies, procedures, and internal controls developed and implemented by an insurance company under this section shall include provisions for complying with the applicable requirements of subchapter II of chapter 53 of title 31, United States Code and this part, integrating the company’s insurance agents and insurance brokers into its anti-money laundering program, and obtaining all relevant customer-related information necessary for an effective anti-money laundering program.”
31 CFR 103.137 also provides for the appointment of a compliance officer ([c] [2]), ongoing training ([c] [3]), and independent testing to see if the company is in compliance with the regulations ([c] [4]).
It is the burden of the insurer to establish the “materiality of the misrepresentations in [the application] ‘sufficiently to warrant the court as a matter of law in directing judgment.’ ” (Cutrone v American Gen. Life Ins. Co. of N.Y., 199 AD2d 1032, 1033 [4th Dept 1993], quoting CPLR 3212 [b].) “To meet that burden, [the insurer is] required to adduce proof concerning its underwriting practices with respect to applicants with similar conditions, establishing that it would have rejected the application if the information had been truthful.” (Id. [citations omitted].) As a result, courts have often found that the affidavits of *965 insurance company underwriters, which claim that the insurer would not have issued policies to certain persons had misrepresentations not been made on the application, are, alone, insufficient to raise a question of fact, when the statements are conclusory. (Id.)
Further, it has been held that the statements concerning underwriting policy made in the affidavits of insurance personnel should be backed by documentary proof. (See Wittner v IDS Ins. Co. of N.Y., 96 AD2d 1053 [2d Dept 1983].)
In the present action, MetLife’s affiants have made reference to the existence of an anti-money laundering program, as required by the PATRIOT Act, by providing the court with internal policy statements apparently meant for its employees’ edification and use in evaluating insurance practices and risks. MetLife has not produced any specific documentary evidence of its underwriting practices, although it has offered the affidavit of an underwriter reiterating that MetLife’s decision to void the policies was made under the mandates of the PATRIOT Act.
The PATRIOT Act is an important piece of legislation containing directives to the insurance industry concerning many aspects of the procurement of policies, revealed through the regulations which have been promulgated thereunder. Despite the paucity of specifics provided by MetLife as to what aspect of the PATRIOT Act would permit it to void the subject policies on the ground that the premiums were paid by Stanley rather than by decedent, this court finds that MetLife has put forth sufficient evidence to show that it may have had reason to revoke the policies, or at least to investigate the situation with regard to Stanley, under its legislatively-required anti-money laundering program, adequate to forestall summary judgment at this time. Whether MetLife’s decision to void the policy was a reasonable exercise of its rights under the PATRIOT Act is a factual question.
Irrespective of the foregoing, it is important to remember that “Insurance Law § 3105 (a) defines a misrepresentation as a false ‘statement as to past or present fact,’ ” rather than future intent. (Federal Ins. Co. v Kozlowski, 18 AD3d 33, 38 [1st Dept 2005].) MetLife must show that decedent did not intend to pay the premiums on the policy himself, at the time of contracting, however likely that fact may appear. Therefore, because evidence of fraudulent intent is within the exclusive knowledge of the plaintiffs, summary judgment will not be granted at this time. (See Auguston v Spry, 282 AD2d 489 [2d Dept 2001].) *966 MetLife will be permitted to explore the circumstances in disclosure proceedings. Conversely, MetLife must set forth in a bill of particulars, the specific conduct alleged to have violated the PATRIOT Act and to specify the provisions allegedly violated.
On the issue of decedent’s medical condition at the time he executed the applications, evidence of decedent’s end-stage medical history, less than a year and a half after signing the applications, shows a very sick man, suffering, at the time of his death, from ailments which appear likely to have been of long standing. These include end-stage renal disease, end-stage liver disease secondary to hepatitis C, and diabetes. (See aff of James J. McCarthy, exhibit B, death summary.) However, decedent answered in the negative when asked on the applications if he had any preexisting medical conditions. The evidence of the severity of decedent’s health so soon after he filled out and signed the applications strongly indicates that the representations made on the applications may have been false and made with knowledge of their falsity. As MetLife has a cause of action under the New Jersey Insurance Fraud Prevention Act, it also has a viable defense to plaintiffs’ action on the ground of possible fraudulent representations made on the applications. Disclosure remains to be taken to determine whether decedent misrepresented his physical health when he executed the applications. Therefore, summary judgment is not appropriate on this issue.
Conclusion
MetLife has raised a question of fact as to whether its revocation of the policies was properly made in compliance with the PATRIOT Act. MetLife has also raised a factual issue as to whether decedent misrepresented the state of his health in such a manner as impaired MetLife’s ability to evaluate his insurability.
Accordingly, it is ordered that the motion for summary judgment is denied; and it is further ordered that the cross motion for leave to amend is granted.

. In Johnson’s affidavit, she claims that at least part of one premium might have been paid for by herself. (Johnson aff at 3.)

. The statute’s full name is “Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism.” (Pub L 107-56, 115 US Stat 272 [2001].)

. MetLife contends that Stanley actually paid premiums on a total of five policies in which he was not identified as the payor on the policy applications, although the present action involves only two of those policies.

. Moreover, it appears that the two statutes, aimed, as they both are, at eradicating fraud in the application process, may be said to be in pari materia, and so, may be read together to achieve that goal. (McKinney’s Cons Laws of NY, Book 1, Statutes § 221.)